Staffer, J.
INTRODUCTION
This matter came before the Court in a jury-waived trial conducted on July 10 and 11, 2003. In this action, the plaintiffs seek declaratory judgment and injunctive relief to resolve a controversy between the parties. In particular, the plaintiffs seek a judicial determination as to the nature and scope of William N. Lanigan Trust’s deeded rights to pass and repass over the Hybels’ property to access the beach. In addition, the plaintiffs seek a judicial determination as to what rights, if any, they have in certain flats which have historically been utilized to gain access to certain tidal flats.
FINDINGS OF FACT
The Plaintiffs’ Property[1]
Jeramy Landauer (“Landauer”) is the trustee of Lanigan Realty Trust (“Trust”). William N. Lanigan, Jr. (“Lanigan”) is a beneficiary of the Lanigan Trust He is also the owner of 16 Wolf Hill Way in Gloucester, Massachusetts.
In 1953, Marion Lanigan, the mother of Lanigan and Landauer purchased several parcels of land along Wolf Hill Way in Gloucester, including Lot 2. This conveyance (“the 1953 deed”) granted an undivided one-quarter interest in certain property described therein.
In 1963, Marion Lanigan purchased, among other property, one of the quarter-share owner’s property (from the Patch family). This then gave the Lanigan family a one-half interest in what was legally conveyed in these documents — the tidal flats located along the Annisquam River between the high and low water lines as depicted on Land Court Plan 1228-C.
Subsequently, Marion Lanigan conveyed a one-eighth interest to Thomas and Mary Trifiro, leaving Marion Lanigan with a three-eighths interest in the property conveyed. In 1984 Marion Lanigan conveyed her interest in several parcels of registered land located on Wolf Hill Way in Gloucester, to the Lanigan Realty Trust. Marion Lanigan died in 1986.
Mary Lanigan’s undivided three-eighths interest passed though her estate to the Lanigan Realty Trust. The beneficiaries of that trust are Jeramy Lanigan Landauer, Regina Hanson and William N. Lanigan, Jr.
The other owners of the tidal flats are the defendants, Roger and Judith Hybels, Thomas Bubier, Roger Ohrtman and Christine Powell.
In 1996 the Lanigan Trust conveyed Lot 2 to William N. Lanigan, Jr.
The Defendants’ Property
Roger and Judith Hybels (“the Hybels”) own the property at 24-26 Wolf Hill Way in Gloucester, Massachusetts. The Hybels’ property abuts the Annisquam River and the flats therein. The Hybels own two lots identified in Trial Exhibit 1 as the Shute Lot and Lot D.
Lot D is bounded on its northeasterly side by Wolf Hill Way, a private way that runs to the Annisquam River. It is bounded on its southeasterly side by the property identified as the Shute Lot. It is bounded on its southwesterly side by property owned in 1953 by Mr. Herman W. Friend. It is bounded on its northwesterly side by the Annisquam River.
The Easement over the Hybels’ Property
Lot D is subject to an easement in favor of real properly described as Lot 1 and Lot 2 on Plan 1228-C, drawn by Matt A. Hautala, Engineer, dated March 31, 1953.
Specifically, as described in the Hybels’ Certificate of Title, Lot D is subject to an easement in favor of Lot 1 to pass and repass on foot over “the foot path running from [Wolf Hill Way] to the summer house and beach shown on said plan, as described in deed from said Edith S. Calder to Roy K. Patch et ux, dated September 17, 1953, and filed as Document 70314.” The current owners of Lot 1 are Douglas Ohrtman and Christie Powell. In 1996 William Lanigan, Jr. became the owner of Lot 1. In 2001, he conveyed Lot 1 to himself as Trustee of the William N. Lanigan Nominee Trust.
The Beach
When Jeramy Lanigan Landauer and William N. Lanigan, Jr. were young, their family referred to the area on the water line south of the gazebo (going towards the Friends’ properly line near the end of the footpath) as “the beach.” The Lanigan family and their guests used this area consistent with their rights of easement. They would access this beach area by use of a set of wooden stairs which would be affixed to the seawall at the beginning of the summer season each year. This practice continued from 1953 to 1964. The Lanigan family would spend the entire summer at their home, beginning in mid-June and ending around Labor Day.
Although the wooden stairs had been placed at this location for many yeans in the past, this practice diminished in recent years. In fact, by the time the Hybels purchased their home, no stairs were being erected on a regular basis at this location. With the exception of *302 Lanigan none of the neighbors, from the Hybels to the Ortmans to the Bubiers appear to have any memory of people utilizing these stairs to access the beach and in turn the water. It appears that for some time, the only user was the plaintiff Lanigan and even at that, his use has been limited and sporadic. Although she used the stairs regularly as a young girl, Jeramy Landauer has not used the stairs for many years. In fact, since moving out of state in 1988, her visits to the family home have numbered three or four times.
The Floats
In addition to accessing the flats (of which the Lanigan family owned %) by the beach on the south side of the gazebo, the Lanigan family and guests also availed of themselves to access by way of certain floats which were attached to the gazebo.
From the Hybels’ gazebo, there is a ramp that is hinged to eyebolts near the gazebo. The other end of the ramp is connected to three floats that sit over the flats. It can best be described as a floating dock (as opposed to one which is anchored to the ground like a wharf with pilings and so on). The float moves up and down with the tides.
Both ramp and floats are constructed of wood and are not designed or constructed to last permanently. On average, a float will last less than ten years. Of the three currently existing floats, one was constructed in 1993, a second in 1999 and a third was constructed this past year. There are no electricity, water, telephone or other utility connections to the floats. The floats are, in fact, designed to be easily removable for storage during the winter months.
At the end of each summer, these floats and accompanying ramp are disconnected from the Hybels’ property and towed away. In the past, they have been stored during the off-season at the Gloucester Marina; although now, the Hybels have found a new company to do this service.
Up until 1999, the costs relating to the construction, maintenance and storage of the floats and ramp were shared voluntarily and equally between the Hybels, William N. Lanigan, Jr., the Ohrtmans and the Bubiers, with each party paying one-fourth of the costs. This was no doubt due to the fact that these neighbors all utilized the floats as one of the best ways to access the flats. There is, however, no contract between the parties which would compel any of them to participate in paying the costs of construction, maintenance and storage of the floats. At the present time, the Hybels are paying the entire costs of the floats. The ability to use the floats is dependent on whether or not a particular neighbor has been asked to participate in the construction, maintenance and storage of the floats by the owner of the property where the floats are located — at present, this is the Hybels. In William Lanigan Jr.’s own words, whether a particular neighbor is asked to be invited “into [the] loop.” This references the loose affiliation of neighbors who have pooled resources in order to be allowed to place the float on the Hybels’ property. Until the Hybels and William Lanigan, Jr. had a falling out over an unrelated property dispute, the Hybels appear to have, if not welcomed, at least accepted the participation of William Lanigan, Jr. in this endeavor.
Of the existing floats, the only float for which William N. Lanigan, Jr. paid any portion of the costs was constructed in 1993. This float has only one or two more years of useful life. The cost of construction of this float was approximately $1200.00. Its current value, or any portion thereof, is de minimus.
The Existing Landscape of the Hybels’ Property
On the Hybels’ property is a worn footpath from Wolf Hill Way, across a portion of Lot D, which leads to a gazebo, again, owned by the Hybels. There is a wooden fence on the southern side of the path that runs the length of the path. On either side of the gazebo, there is access to the water. On the south side of the gazebo, practically, one would need a set of stairs to get down to what would be the sandy area in low tide. At high tide, one would go into the water directly off the stairs. The Hybels do not currently have a set of steps on the south side of the gazebo nor do they desire such steps. On the other side of the gazebo (what the Court will refer to as the “riprap” side), there are three stone steps running from the gazebo which lead down to a path between the riprap and the seawall. This path between the riprap and seawall leads back toward Wolf Hill Way and to property-owned by Thomas Bubier. The path between the riprap and the seawall has recently been improved by the Hybels by the addition of gravel which has evened its surface. The Hybels have also created an additional path to the sea in this general area. Approximately fifteen feet from the gazebo, there are now four stone steps that lead directly from the footpath between the riprap and seawall to the water.
Although the Lanigan family has traditionally used the wooden stairs to access the water beyond the gazebo, there is no impediment to using the other access ways. While various members of the Lanigan family may prefer to use this route for their own reasons, it does not appear in any meaningful way to be superior to that means proposed by the Hybels. The plaintiffs have suggested that there are safety concerns because the beach on the south side is protected from approaching boaters. However, this Court heard insufficient evidence to make such a finding (particularly given that the entire area of the flats is in a no-wake zone). Indeed, the Court took a view of the location and saw no evidence of a dangerous condition. Therefore, the Court will not find that the south side of the gazebo provides a safer means of access to the flats.
RULINGS OF LAW
The standard of proof in a civil case is that a plaintiff must prove his case by a preponderance of the evidence. A proposition is proved by a preponderance of the evidence if, after this Court has weighed the evidence, that propositan is made to appear more likely or probable in *303 the sense there exists in the Court’s mind an actual belief in the truth of that proposition derived from the evidence, notwithstanding any doubts that may still linger in the Court’s mind.
Access to the Beach
There is no question but that the plaintiff, Lanigan, has an easement permitting him to pass over the Hybels’ property in order to gain access to the flats. The plaintiffs have argued that the “beach” referenced in the title documents mean that part of the water’s edge that they, the Lanigan family and friends, have traditionally utilized many years ago. The defendants argue that the word “beach” in the title documents means no more than what it ordinarily means: a sandy or pebbly shore of a body of water. The defendants further suggest that since the wooden steps to access the south side of the beach are not there all year round, and the easement holders are entitled to year-round access to the beach, beach can only means access by the stone steps leading away from the gazebo and over the riprap.
This Court is not persuaded that the only access to the flats must be in the manner preferred by the plaintiffs. The title documents simply use the term “beach.” In construing or interpreting a deed, doubts as to the meaning of the deed are certainly to be read in favor of the grantee. Thayer v. Payne, 2 Cush. 327, 331 (1848). However, the title documents fail to delineate a certain part of “the beach.” Rather, the only reasonable reading is that the beach means some kind of access from the land along the water. That the access was on the south side of gazebo for many years is not dispositive and cannot serve as a basis to interpret the language in the deed. The simple fact is that the arrangement which existed many years ago was borne of friendship and civility, both of which appear to be sorely lacking today. Jeramy Landauer described people sitting around on lounging chairs on what is now the Hybels’ property, in front of the wooden stairs. The fact that the Lanigan enjoyed this bathing area established on what is the Hybels’ property does not mean that “the beach” is confined to the south side of the gazebo.
Even if the location of the easement was originally on the south side of the gazebo, the Hybels have the ability to relocate that easement. Such relocation is lawful if it does not materially inconvenience the easement holders. Lowell v. Piper, 31 Mass.App.Ct. 225 (1991). A decision to relocate the easement does not require the consent of the easement holders. To so require would grant the easement holders “such control over the servient estate as to give them almost a possessory interest in it.” Lowel at 199. What is required in the event of a relocation is that such relocation not materially inconvenience the easement holders. Here, as already discussed, it is certainly clear that the plaintiffs prefer the south side of the gazebo for access to the flats. It is no doubt true that the south side may well be marginally more appealing aesthetically. However, some of that appeal is not due to the location of the easement per se but rather because there were chairs to relax in near the wooden stairs, thus making it a nice little sitting and sunbathing area. Given that the Hybels are certainly under no obligation to provide such an area (and plaintiffs certainly do not suggest otherwise), this side of the beach is not otherwise more convenient for the easement holders to gain access to the flats. Clearly, the easement holders are free to access the flats from the steps off of the gazebo and from the riprap. Even the plaintiff, Lanigan, agrees on this. The easement holders are entitled to reasonable access to the flats via the beach. The means suggested by the Hybels is reasonable, safe and a fair substitute for the wooden steps. While the means devised by the Hybels may not be the preferred method for the easement holders, this alternative route does not materially inconvenience the easement holders and as such is lawful.
The Floats
The plaintiffs have argued that they have a right, again pursuant to the title documents, to access the flats by means of the floats which are attached to the Hybels’ gazebo. The plaintiffs argue that the Calder deed to Marion Lanigan contains all of the elements required for a contract to convey the ownership of the floats to the parties. Were this a case over ownership of those floats which existed at the time of the Calder deed, the plaintiffs would no doubt have a point. However, it is undisputed that the maintenance and storage of the currently existing floats has been paid for by the Hybels. These floats are not attached in any permanent manner to the ground or the gazebo. Those floats are personal property, not unlike a dinghy tied up to a dock for access to the water. See, e.g. Estate of Shirty Morgan, [CCH Dec. 19,625], 51 T.C. 478 (1969) (floats are “tangible personal property” within the meaning of the Internal Revenue Code of. 1954), aff'd., 448 F.2d 1397 (9th Cir. 1971); Newport Island Yacht Club v. Inver Grove Heights Marina Inc., slip, op. C.A. No. C5-94-1204, 1995 WL 70215 (Minn.Ct.App. Feb. 21, 1995). It is true that the title documents appear to attempt to convey an interest in “floats,” specifically the 1953 deed from Edith Calder. However, to the extent that an interest in flats was conveyed, those floats have long since been replaced. Beyond that there is no language in the 1953 deed which grants any type of easement or other legal interest in the existing floats.
As far as any other source of a legal right to the floats, the plaintiffs have failed to prove the existence of any other type of binding agreement, e.g. a contract, between these parties in the instant action, which would compel the Hybels to remain in a permanent arrangement regarding any floats they may or may not choose to attach to their gazebo. To the contrary, it is uncontroverted that the manner in which the floats were built, maintained, stored and paid for reflects a voluntary association. This voluntary association was one in which the property owner, in the present case, the Hybels, permitted neighbors to buy into the opportunity to enjoy the floats by assisting to shoulder the costs attributed to the floats. *304 That the Hybels no longer choose to include others in maintaining and storing the floats is their own choice.[2]
The defendants correctly observe that the only possible interest which the plaintiff, Lanigan, might continue to have in the floats would be based on the fact that in 1993, Mr. Lanigan contributed a small portion toward a float which is very near the end of its useful life. Given that its original cost was $1200 of which Lanigan only contributed one fourth of that sum, and that the float is near the end of its service, this Court finds that any amount owed to Lanigan as a rebate on his contribution is negligible.
CONCLUSION
The Lanigan family have two property rights: one is a possessory interest in the flats along the Annisquam River described in the 1953 deed. The other right is to access those flats by way of an easement on the Hybels’ property. It is unfortunate that the long happy history of the Lanigan family’s enjoyment of their properly and that of their neighbors should have ended in this litigation. It is clear to this Court that the Hybels have continued to treat their neighbors with hospitality and far from standing on their legal rights, with the exception of Mr. Lanigan, have permitted their neighbors to partake of their gazebo and floats. This Court has not made a finding of fact regarding the genesis of the difficulties between the parties to the present action since it is not relevant. However, it is clear to the Court that any blame for the loss of enjoyment of certain privileges — not rights — must be placed squarely at the feet of William N. Lanigan, Jr. The Hybels’ current insistence on granting the Lanigans only that which they are legally compelled to do is not a product of any unlawful action or indeed mean spiritedness on their part. Rather, this is an instance where the conduct of one party, Mr. Lanigan, has in essence “killed the golden goose.” The Lanigan family’s longstanding use of the entire expanse of beach, gazebo and floats was not found in legal documents but rather borne of friendship. That such a friendship between these parties does not exist is regrettable but not unlawful.
ORDER
The plaintiff, Jeramy E. Landauer, Trustee of Lanigan Realty Trust, has a right in common with the other owners of the flats of the Annisquam, as described in Plan 1228-C.
2. Neither of the plaintiffs have any right to the currently existing floats. They are the personal properly of the Hybels. Any use of these floats by anyone but the Hybels can only be by permission of the Hybels.
3. The plaintiff, William N. Lanigan, Jr. has an easement over the Hybels’ properly to access said flats. That easement permits Lanigan to access the flats by the beach.
4. The Hybels have currently located that easement allowing access to the flats over their properly at the steps running from the gazebo and the riprap.
5. The Hybels are under no obligation to install or maintain any steps on the south side of the gazebo.
6.No other person, other than the Hybels, has permission to place any structure, such as wooden stairs, on the Hybels’ properly.

 In this decision, the Court from time to time refers to the plaintiffs as one entity. However, the rights for which plaintiffs seek a determination run to William Lanigan, Jr. as regards the easement to the beach and rights regarding what interest exists in the “flats and floats” is held by Ms. Jeramy Landauer on behalf of the Trust. However, given this Court’s ruling on certain threshhold issues, the legal holder of these rights is not relevant and no distinction between which Lanigan owns what is necessary.

 It is worth noting that while the Hybels have abandoned the more formal arrangement of sharing the costs and resulting use of the floats with their neighbors, they continue to welcome many of those in the neighborhood to enjoy the use of these floats. That the Hybels have chosen not to Include a hostile neighbor is not surprising. This Court will not, through judicial flat, mandate how and with whom the Hybels socialize.