STANLEY A. LOWELL & another[1] vs. DAVID PIPER[2] & another.[3]

No. 89-P-1007.

Plymouth. December 6, 1990. - August 15, 1991.

Present: BROWN, PERRETTA, & JACOBS, JJ.

*Easement. Real Property*, Easement. *Deed*, Construction.

In a declaratory proceeding to determine the rights of the owners of the dominant and servient estates under provisions in a deed granting the plaintiffs, operators of a cranberry bog, an easement to maintain certain components of the water system for the bog "at their present location" on the individual defendant's land, this court concluded that the quoted language did not preclude the defendant from relocating the water system as he proposed, provided that the relocation would not interfere with a substantially uninterrupted flow of water to the bog; in the circumstances, the case was remanded for specific findings on the effects of the proposed relocation and entry of a new judgment protecting the plaintiffs' rights under the easement. [228-232]

CIVIL ACTION commenced in the Superior Court Department on September 16, 1988.

The case was heard by *James J. Nixon*, J.

The case was submitted on briefs.

*Robert E. Allen, Jr.*, for the plaintiffs.

*Martin J. Drilling* for the defendants.

PERRETTA, J. This appeal by the plaintiffs from a declaratory judgment concerns the right of the defendant Piper, the owner of the servient estate, to move certain components of a water and an electric power system, specifically, a penstock[4]

---

[1]Anne-Marie Lowell.

[2]Individually and as trustee of Investment Realty Trust.

[3]Myles Standish Village, Inc.

[4]As defined in Webster's Third New International Dictionary (1971), a penstock is a "sluice gate, or valve for restraining, deviating, or otherwise regulating a flow (as of water or sewage)."

226         31 Mass. App. Ct. 225

Lowell *v.* Piper.

and electric power lines. The plaintiffs were granted easements for those systems which they use in cultivating their cranberry bog, and they object to Piper's proposals. The judge concluded that because Piper's intended use of his land would not be inconsistent with the plaintiffs' rights, the relocations could be made. The plaintiffs argue that the sites for the penstock and power lines are fixed by deed and cannot be changed without their consent. We conclude that the changes are not precluded by the deed creating the easements, provided that any relocation does not interfere with the plaintiffs' right to a substantially unrestricted flow of water to their bog. Because the disputed evidence on the question of disruption in the water flow was not settled pursuant to Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), we vacate that portion of the judgment relating to the water system and remand the matter for further proceedings.

1. *The respective estates.* On June 14, 1971, John Shaw, cranberry grower, and his wife conveyed two portions (Parcel 1 and Parcel 2) of their tract of land to the plaintiffs. These two non-adjoining parcels are surrounded by land which the Shaws retained until they conveyed it to Piper.

The plaintiffs' bog is in the southeastern portion of Parcel 1. A drainage pipe runs from the northeastern corner of their bog to a bog on the adjoining land retained by the Shaws and now owned by Piper. There are 23,000 volt electric transmission line wires, poles, and fixtures on Parcel 1 and Piper's surrounding land.

A pump house sits on Parcel 2 which is to the northwest of Parcel 1, with Piper's land in between. A flowage canal runs easterly from the pump house and across Piper's land to a point where it turns sharply to continue southeasterly, for about forty-five feet, to a penstock. To the south of the canal and coming from the west, there is a drainage ditch. The ditch runs somewhat northeasterly until it joins with the canal at the penstock. Still on Piper's land, the now combined drainage pipe and flowage canal continue southeasterly from the penstock to Parcel 1.

The layout of the water system, including the drainage pipe running from the northeastern corner of the plaintiffs' bog to the bog on the servient estate, enables the plaintiffs and Piper to flood and drain their bogs. Unlike the Shaws and the plaintiffs, however, Piper does not want to cultivate cranberries. Rather, he wants to develop his land and build the Myles Standish Estates. His plans call for a road at the site of the penstock. Piper wants to move the penstock from its present position and relocate it, forty-five feet to the north, on the canal where it changes its course from easterly to southeasterly. Additionally, Piper wants to move the electric power lines and lay them underground.

In claiming that the penstock and power lines cannot be moved for any reason without their consent, the plaintiffs rely upon the following language in their 1971 deed from the Shaws:

> "There is also granted as appurtenant to the above two parcels the right to use at any time *at their present locations as shown on said plan,* the flowage canal, drainage ditch, penstock and combination flowage and drainage pipe, and the right to enter upon the land adjacent to them to operate and maintain them, but reserving to the grantors, their heirs or assigns, the right to construct bridges, culverts or roadways across said canal, drainage ditch and combination flowage and drainage pipe provided said construction does not substantially restrict the flow of water.
>
> "There is also granted an undivided one half interest in the existing 23,000 volt electric transmission line wires, poles and fixtures *as now located* on Parcel 1 and on other land of the grantors and on adjacent land of Crane Brook Company" (emphasis supplied).

At trial, Piper presented evidence to the effect that the new penstock would cause no disruption to the water flow used by the plaintiffs in working their bog. An engineer testified that the new penstock is technically more advanced and efficient. Moreover, it will be enclosed and sheltered from cu-

rious children. The configuration of the canal is such that the penstock will fit easily and take little time to put in place. The present penstock will be left untouched until the new penstock is working.

Piper's witnesses would not say that the proposed road could not be laid to the east of the penstock, thereby avoiding the whole problem. Rather, the proposed location for the road is "to the best advantage of the applicant of the subdivision, and it keeps the roadway in a nice straight fashion."

Stanley Lowell, on the other hand, had serious doubts about the placement of the penstock on a site which he described as steep sandy soil with a "fairly high" water table. He disputes that the configuration of the canal can remain the same and feed water into the penstock at its proposed location. Moreover, changing the shape of the canal will require digging which will destroy the vegetated soil, leaving pure sand which cannot stabilize itself. Even assuming that the canal could be lined with cement, as suggested by the judge, Lowell did not agree that the problem would be solved. He explained that there is an elevation difference of ten feet between the canal and the ditch; if the canal is moved, it will have an impact on the ditch and the pipe.

It appears from Lowell's testimony that any work on the pipe presents yet another issue: "[T]hey want to raise the pipe and the Conservation Commission ordered them to leave it in its natural state so you wouldn't have the water funnel go down there quick through a pipe. . . ." In sum, Lowell's objection to the relocation of the penstock was based upon his concern that the irrigation system would not thereafter work as well as it now does.

2. *The rights of the parties.*

Without settling the disputed evidence relating to the extent of the interference, if any, with the plaintiffs' easements, the judge concluded that if Piper's proposed uses of his land did not "substantially" restrict the flow of water to the plaintiffs' bog, then his "actions will be entirely within the letter and spirit of the easement and the law." However, should the construction cause any impairment of the plaintiffs' rights,

then Piper could be required "to take measures to accommo-
date" the holders of the easements.[5]

  It is the plaintiffs' argument on appeal that no matter how
reasonable Piper's proposals may be, they are inconsistent
with the clear and unambiguous language of their deed. In
short, they read the terms "at their present locations as
shown on said plan" and "as now located" to mean that the
penstock and power lines must remain where and as they are
until the plaintiffs consent to the relocations. We find no sup-
port for their assertion which, if accepted, would, in our
view, vest in them such control over the servient estate as to
give them almost a possessory interest in it. See Restatement
of Property (1944) § 450 comment b. ("An easement is an
interest in land in the possession of another. It is not, itself, a
possessory interest. The owner of it, therefore, is not entitled
to the protection which is given to those having possessory
interests. The fact that the owner of an easement is not
deemed to have a possessory interest in the land with respect
to which it exists indicates a lesser degree of control of the
land than is normally had by persons who do have possessory
interests"). See generally, 3 Powell, Real Property § 407
(1991).

  Whether the penstock and power lines may be moved de-
pends upon the extent of the privilege of use conveyed to the
plaintiffs and not their acquiescense. "The law, carrying into
effect the intention of the parties, does not intend to restrict

---

[5]We do not separately consider Piper's proposals concerning the electric
power lines for a number of reasons. Although the language in the deed
pertaining to the electric system is quite different from that used with re-
spect to the water system ("an undivided one half interest" as compared
with the "right to use," respectively), the parties have proceeded, at trial
and before us, on the basis that both provisions created easements. There
being no argument concerning the nature of the plaintiffs' interest in each
of the systems, we proceed on the undisputed premise that both clauses
conveyed easements and no more. Additionally, there was no conflict in the
testimony concerning the electric system. The evidence overwhelmingly
supports the judge's conclusion that the relocation of the power lines will
benefit, rather than burden, the plaintiffs. Finally, the only argument made
by the plaintiffs on appeal is that all the proposed plans are precluded by
the deed.

the right of ownership of the real estate subjected, further than is necessary to give full effect to the easement; and public policy requires . . . that an owner of real estate should be allowed to make all the improvements upon it, which can be made consistently with the just rights of others." *Atkins* v. *Bordman*, 2 Met. 457, 471 (1841). See also *Western Massachusetts Elec. Co.* v. *Sambo's of Mass., Inc.*, 8 Mass. App. Ct. 815, 818 (1979), and cases therein cited.

In determining the extent of the plaintiffs' privilege of use, we are not restricted to the language of their deed. "The extent of an easement depends on the circumstances of its creation . . . . When created by conveyance, the grant or reservation 'must be construed with reference to all its terms and the then existing conditions so far as they are illuminating.' *J.S. Lang Engr.* v. *Wilkins Potter Press*, 246 Mass. 529, 532 (1923). *Hewitt* v. *Perry*, 309 Mass. 100, 105 (1941)." *Mugar* v. *Massachusetts Bay Transp. Authy.*, 28 Mass. App. Ct. 443, 444 (1990). See also Restatement of Property §§ 482 & 483 (1944).

It is apparent from the deed and the plan that the water and electric systems were used in cultivating both bogs shown on the plan.[6] Further, in addition to the previously recited testimony of Stanley Lowell, he stated that when Parcels 1 and 2 were conveyed to his wife and to him, everyone knew that at some future time the surrounding land would be developed. For that reason, the easements were specifically worded to allow for construction and prevent any disruption to the water flow to his bog. When the penstock was built in the late 1930's or early 1940's, it was placed in what was regarded as the "best location." As explained by Lowell, its placement at the present site required less pipe, and the "topography of the land is very steep slopes and it's sandy soil

---

[6]The Shaws reserved for themselves, their heirs or assigns the "perpetual right and easement and at any time to pump water out of the cranberry bog partly shown on the plan near the Northeast corner of Parcel 1 when there is water therein and the right to drain water into said cranberry bog, both rights to be exercised through the drainage pipe shown on said plan . . . ."

and I imagine at that time when it was dug it wouldn't hold vegetation very good."

Based upon the exhibits and Stanley Lowell's undisputed testimony concerning the existing conditions at the time of the conveyance, we conclude that the plaintiffs' easements give them the right to use the water and electric systems to maintain and regulate the flow of water in the cultivation of their bog. It follows from this conclusion that Piper may not use his property in a way that is inconsistent with this right or in a way "that would lead to a material increase in the cost or inconvenience to the easement[s] holder[s'] exercise of [their] rights." *Texon, Inc.* v. *Holyoke Mach. Co.*, 8 Mass. App. Ct. 363, 366 (1979).

Because of the conflicting testimony, it is not apparent from the evidence that Piper's proposed relocation of the penstock is consistent with the easement. If Stanley Lowell is correct, the new site will have an impact on the canal and the drainage ditch as well as the combination pipe. Moreover, this impact may, in turn, be of concern to the conservation commission or in contradiction of its order to which there was only fleeting reference. Not only were these concerns not addressed by Piper's witnesses, there was testimony from them to the effect that the relocation of the penstock was motivated by aesthetics, that is, to lay the proposed roadway "in a nice straight fashion."

The plaintiffs have presented evidence which, if found credible, shows that Piper's proposals may present an immediate and perhaps unnecessary risk of disruption to or interference with the water flow to their bog. Although we conclude that the plaintiffs are not necessarily entitled to an injunction prohibiting any relocation of the penstock, we also conclude that their rights are entitled to greater protection than that which the judgment presently affords them.

In its present form, the judgment allows Piper to place the penstock anywhere so long as his use of his land is not inconsistent with the plaintiffs' easement. The plaintiffs are protected only to the extent that if their rights are thereby impaired, Piper "may be required to take measures to

accommodate" them. Although the judgment may be a correct statement of the law in the abstract, it does not declare and protect the rights of the parties in the context of this immediate dispute. Further, it is impossible to determine on this record the specific rights of the parties.

The case must be remanded to the Superior Court for findings of fact on the questions of: specifically where along the water system Piper intends to place the penstock; the effects, if any, of the relocation on the flowage canal, the drainage ditch, and the combination pipe and canal; what measures will be taken by Piper to prevent any disruption to or interference with the plaintiffs' right to a substantially unrestricted flow of water necessary to the cultivation of their bog; and any other matters not herein mentioned but which, consistent with this opinion, may require resolution. We leave to the trial judge the question whether additional evidence should be taken.

Accordingly, paragraphs one and three of the judgment, declaring that Piper may relocate the penstock and denying the plaintiffs injunctive relief, are vacated, and the case is remanded to the Superior Court for further proceedings. Paragraph two of the judgment, allowing Piper to lay the electric power lines underground, is affirmed and is to stand as a separate final judgment. None of the parties is to have the costs of appeal.

*So ordered.*