HANLON, J.
*689 Sea Lavender, LLC (Sea Lavender) appeals from a second amended judgment issued by a judge of the Superior Court declaring that Sea Lavender has no legal right to use a sewage pump station located on the abutting property of the plaintiff, Sandra A. Assad, trustee of the S.C.S. Realty Trust, and awarding damages to the trustee for trespass. We conclude that the parties' predecessors in title had agreed to modify the terms of an express easement to permit Sea Lavender to use the pump *690 station. In addition, we are persuaded that the trustee is estopped from denying the servitude.
Background. We draw the undisputed facts from the summary judgment record. All of the property at issue is located in Wareham (town) and at one time was owned by Earnest Blanchard. On or about April 22, 1974, the town planning board endorsed a plan Blanchard had submitted as a plan for which "approval under the subdivision control law [was] not required" (ANR plan). The ANR plan showed Blanchard's property divided into three lots. On or about June 1, 1974, Blanchard conveyed lot 2 as shown on the ANR plan (lot 2) to William Goyette (Goyette) by a deed containing the following express easement:
"All of the above premises are also conveyed together with the right to dig, excavate, maintain, and repair and do any and all other acts that might be necessary for the continued operation and use of so much of the sewerage system and related drains, pipes, leaching *880 fields or beds as may be presently located on lot 3, for the benefit of [l]ot 2."
Almost two years later, on or about May 5, 1976, Blanchard conveyed lot 3 as shown on the ANR plan (lot 3), to Tremont Nail Company (Tremont), a division of W.H. Maze Company (Maze). The deed expressly provided it was subject to the same sewerage easement for the benefit of lot 2.
Goyette operated the Mill Pond Diner (diner) on lot 2. Tremont operated a company store on lot 3. Subsequent transfers of lot 3 between related entities resulted in Maze taking title to lot 3 in 1989. All of these relevant deeds contained the sewerage easement for the benefit of lot 2. Beginning in 1993, Sandra Assad and her husband, John Assad (together, the Assads), leased lot 3 from Maze and operated a store on the property.
The record reflects that at all times between 1974 and 2001, a single private septic system serviced lots 2 and 3. Sewage from lot 2 was discharged into two septic tanks located on lot 2, and then traveled through underground drainage pipes into a cesspool and leaching fields located on lot 3. As detailed below, the lot owners eventually moved to a different means of disposing of the sewage collected on each property by pumping it into the municipal sewer system for off-site treatment and disposal. While these technological means are different in some important respects (such as their particular environmental consequences), from *691 the property owners' perspective, they serve as two alternative systems for piping away the sewage generated on the properties.
Among its various properties, Maze also owned a manufacturing plant located across the street from lots 2 and 3. According to William Driscoll, the general manager of Tremont, in 1999, Maze determined it would be in the company's best interest if the manufacturing plant could tie into the town's sewer system. For over two years, Driscoll worked with engineers and the town to create a pump station on lot 3 with sufficient capacity to tie in all of Maze's properties as well as some of the neighboring properties, including the diner on lot 2. Although Driscoll averred in his affidavit that Goyette was interested in having the diner tie into the pump station and the town sewer, the affidavit does not state whether Driscoll approached Goyette or whether Goyette approached Driscoll regarding the proposed tie-in. However, according to Driscoll, Goyette met with Driscoll several times and they negotiated a deal whereby Goyette paid Tremont a fixed sum to tie into the pump station and the town sewer system. Together, Maze and Goyette spent close to $200,000 to create the pump station as well as the piping system leading to the town sewer system. Driscoll averred that there was no agreement for Goyette to pay any additional maintenance or user fees to Tremont or Maze. The affidavit is silent as to whether Goyette's existing easement was discussed.
On September 27, 2001, the town issued sewer permits approving the tie-in of lot 3 to the town sewer system via the pump station. The approved sewerage and pump design plan specifically showed that the existing grease trap adjacent to the diner was to remain, the existing septic pit was to be abandoned, and "[n]ew PVC piping [from the diner] [was to] ... be connected to [the] existing sewer line."
Around the same time that the pump station was completed, Maze, after negotiations with John Assad, sold lot 3 to the trustee. The trustee averred that, at the time she purchased lot 3, she was aware that the owner of lot 2 was using the pump station on lot 3 to dispose of the sewage from the diner located on lot 2. She also *881 testified at a deposition that the pump station was installed to replace the cesspool. According to Driscoll, who negotiated the sale of lot 3 to the trustee, the Assads "were fully aware of the pumping station and of the properties which were connected to the pumping station which included the ... [d]iner and the buildings that the Assads purchased." *692 From 2001 through 2004, any costs associated with the pump station were paid by Tremont. The costs were minimal. In 2004, Maze sold the manufacturing plant property to the town. Thereafter, the record suggests that until sometime in 2011, the town paid the costs associated with the pump station because the meter for the station was on that property. Each of the properties tied into the system also paid its own sewer assessments to the town.
In February 2011, Goyette died and his wife, Lorrain Goyette, became sole owner of lot 2. When the Assads sought to tie in additional buildings to the town sewer in 2011, the town realized it had been paying the costs of the pump station on lot 3 and sought to recoup those costs from the trustee. Disputes arose between the Assads and Lorrain Goyette regarding her contributions to the costs of maintaining the pump station. Sandra Assad, individually and as trustee, began and later settled litigation regarding the claim that Lorrain Goyette owed her maintenance fees; Lorrain Goyette's counterclaim for damages also settled. During the course of that litigation, John Assad plugged the sewerage line coming from the diner with cement, causing a backup of raw sewage into the diner. John Assad admitted he did this because Lorrain Goyette had not been contributing promised payments for the costs of operating the pump station.
While the District Court case was still pending, Lorrain Goyette sold lot 2 and the diner to Sea Lavender on July 21, 2014 for $200,000. She had been struggling financially and Sea Lavender's principal, Joseph Zeadey, had been a friend of Goyette and bought the diner in part to help her out. The Assads then approached Sea Lavender to pay the expenses of maintaining the pump station. Zeadey made some initial payments but negotiations between the parties broke down and Zeadey stopped making payments. The trustee then began this action in the Superior Court seeking a declaration that Sea Lavender had no legal right to continued use of the pump station (Count I), damages for trespass (Count II), an injunction ordering Sea Lavender to cease using the pump station (Count III), and damages for violation of G. L. c. 93A (Count IV).
The parties filed cross motions for summary judgment. A judge of the Superior Court granted summary judgment to the trustee, concluding that the easement Blanchard had granted over the drains, pipes, and leaching fields "as may be presently located on [l]ot 3" was limited to the sewerage system, i.e., the cesspool and leaching fields, in place at the time of the 1974 deed. The judge *693 concluded that Goyette had acquiesced in the dismantling of the cesspool and leaching fields and paid Tremont a fixed sum to help construct the pump station to tie lot 3 into the town system, and thereby evidenced an intent to abandon the easement in favor of an oral agreement with Tremont to allow waste from lot 2 to flow across lot 3 and be pumped into the town sewer.
The trustee filed a motion to amend the judgment, seeking damages for trespass, injunctive relief, and G. L. c. 93A damages. The judge entered an amended judgment finding a continuing trespass by Sea Lavender and granting injunctive relief to the trustee. However, he entered judgment in favor of Sea Lavender on the c. 93A claim. After an assessment of damages hearing, *882 the judge issued a second amended judgment awarding the trustee damages in the amount of $32,978.25. Sea Lavender appeals.
Discussion. "We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party, 'all material facts have been established and the moving party is entitled to judgment as a matter of law' " (citation omitted). Sea Breeze Estates, LLC v. Jarema, 94 Mass. App. Ct. 210, 215, 113 N.E.3d 355 (2018). Where the parties filed cross motions for summary judgment, we determine whether either party is entitled to judgment as a matter of law. Winbrook Communication Servs., Inc. v. United States Liab. Ins. Co., 89 Mass. App. Ct. 550, 550, 52 N.E.3d 195 (2016).
Express easement. "The general principle governing the interpretation of deeds is that the intent of the parties is 'ascertained from the words used in the written instrument interpreted in the light of all the attendant facts.' " Perry v. Nemira, 91 Mass. App. Ct. 12, 17, 69 N.E.3d 592 (2017), quoting Hickey v. Pathways Ass'n, 472 Mass. 735, 744, 37 N.E.3d 1003 (2015). The interpretation of an easement is a question of law for the judge. See Sullivan v. O'Connor, 81 Mass. App. Ct. 200, 204-205, 961 N.E.2d 143 (2012). We also are mindful that doubts as to easements "are to be resolved in favor of freedom of land from servitude." Butler v. Haley Greystone Corp., 352 Mass. 252, 258, 224 N.E.2d 683 (1967).
Here, there is no need to go beyond the four corners of the express easement to conclude that a material purpose of the easement was to enable lot 2 to continue to use the septic system on lot 3. The easement expressly granted lot 2 the right to do anything necessary to enable it to continue using that system. Moreover, it is clear from the attendant circumstances that, at the time the easement was granted, the only septic system available *694 to lot 2 was via connection from the diner through pipes that crossed lot 3 and terminated in the leaching fields on lot 3. In concluding Goyette abandoned the easement, the trustee and the judge appear to focus on the language in the easement that granted lot 2 the right to use the leaching fields on lot 3 -- as if the leaching fields were the only relevant part of the easement. In so doing, they discount the fact that the easement also granted lot 2 the right to use and maintain the "sewerage system and related drain pipes" located on lot 3. The plan for the new sewerage system reflected that new gravity PCP piping from lot 2 was to be "connected to [the] existing sewer line." To that extent, at least, the new system was no different from the old system.
It is true that the ultimate destination of the existing sewer line changed. Rather than empty into leaching fields, the plans reflected that lot 2's sewage was to be directed to the existing sewer line and eventually to a pump station and then to the town's sewer system. It is clear from the Driscoll affidavit that Maze and Goyette both agreed to eliminate the leaching fields and replace them with the pump station to the town sewer. Indeed, the plan itself reflected that the leaching fields would be abandoned. We agree, therefore, that Goyette abandoned his easement over the leaching fields. See Brookline v. Whidden, 229 Mass. 485, 492, 118 N.E. 981 (1918) (where owner of dominant tenement gives parol license to owner of servient tenement to obstruct easement, easement is to that extent modified). Goyette did not take any action, however, that would allow us to infer that he abandoned the piping crossing into and over lot 3. Nor did he abandon the leaching fields without a substitute *883 method of disposing of the sewage from his property -- the pump station to the town sewer.
A comparison is instructive here. With regard to roadways, "[i]t is well settled that the owner of land subject to a right of way may, with the assent of the owner of the dominant estate, substitute on his own land a new way for the old way, and that when the change is actually made and a new way is thus adopted by them, it fixes and determines their respective rights by dedication or by estoppel." Byrne v. Savoie, 225 Mass. 338, 340, 114 N.E. 367 (1916). We discern no meaningful difference between substituting a new roadway by agreement and substituting a pump chamber and connection to the public sewer in lieu of leaching fields. Here, the conclusion that Goyette and Tremont agreed to substitute the pump station and piping to the town sewer for the leaching fields is compelled by their actions, the continuous and ongoing connection *695 to existing sewer pipes on lot 3, and, indeed, the abandonment of the leaching fields.
Contrary to the trustee's argument, Goyette's decision to contribute to the cost of the new method of disposing of the sewage is not inconsistent with the easement or evidence that he abandoned the easement. Goyette's easement right to maintain the original system (the leaching fields) would have been at his own cost. He reasonably could have made a "business decision" with an eye toward long-term solutions and concluded that connection to the town sewer was in his best interest as well. That he was willing to contribute to the price of creating such a system does not mean he was abandoning other portions of the existing system, including the sewer drain pipes, on lot 3. While he may have abandoned the existing leaching fields, those were replaced with the pump station. See Wall St. Dev. Corp. v. Planning Bd. of Westwood, 72 Mass. App. Ct. 844, 850, 894 N.E.2d 1139 (2008) (easement was not extinguished but only modified by consent judgment to which all parties agreed).
We do not ignore the fact that lot 2's easement specifically provided that it applies to the system "as may be presently located on [l]ot 3." That language likely would have prevented Goyette from unilaterally constructing a new system elsewhere on lot 3. However, that language simply did not prevent the lot owners from agreeing to substitute a pump station leading to the town sewerage system for the leaching fields. In M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 93, 809 N.E.2d 1053 (2004), when considering whether a servient estate may move an easement without the dominant estate-holder's consent, the Supreme Judicial Court stated that "[c]learly, the best course is for the [owners] to agree to alterations that would accommodate both parties' use of their respective properties to the fullest extent possible" (citation and quotation omitted). See Lowell v. Piper, 31 Mass. App. Ct. 225, 230, 575 N.E.2d 1159 (1991) ("In determining the extent of the plaintiffs' privilege of use, we are not restricted to the language of their deed"; servient estate's proposed relocation is consistent with purpose of easement if steps are taken to prevent disruption of plaintiff's rights).
The trustee insists that this was not a modification of the existing easement because Goyette could have continued to use the leaching fields. However, the record does not clearly establish whether Goyette could have continued to use the leaching fields or whether they had to be abandoned. We need not resolve the issue because, in order for parties to agree to a modification of an *696 easement, there is no requirement that the original easement must have failed in some way or have *884 become impossible to use. Thus, whether or not the existing system was functional at the time the parties agreed jointly to create a system that would discharge to the town sewer is irrelevant to the issue whether the easement was modified by agreement.
We are satisfied that the actions of Goyette and Tremont clearly indicated that the pump station and pipes to the town sewer system were substituted for Goyette's rights over the leaching fields. That Goyette contributed financially to this upgrade does not negate his easement. Moreover, the trustee was aware that the pump chamber replaced the leaching fields and that Lorrain Goyette was using it before the trustee purchased lot 3. As a result, the trustee cannot now unilaterally terminate the easement.
Estoppel. Sea Lavender asserts that even if the judge had concluded correctly that Sea Lavender had no rights under the express easement, the trustee should be estopped from denying its right to connect to the pump station and town sewer system. We agree. See Byrne, 225 Mass. at 340, 114 N.E. 367. The Restatement (Third) of Property (Servitudes) § 2.10 (2000) (Restatement) provides that
"[i]f injustice can be avoided only by establishment of a servitude, the owner or occupier of land is estopped to deny the existence of a servitude burdening the land when:
(1) the owner or occupier permitted another to use that land under circumstances in which it was reasonable to foresee that the user would substantially change position believing that the permission would not be revoked, and the user did substantially change position in reasonable reliance on that belief."[2]
*697 No actual oral promise is required. Id., comment b. The summary judgment record establishes that Goyette, having a sewerage easement over lot 3, contributed substantial sums to replace the septic system's leaching fields with a pump station and piping leading to the town's sewer system and was allowed by the servient estate owner to connect to the pump. Tremont reasonably should have foreseen that Goyette would not have contributed substantial sums to the creation of a sewage disposal system if permission to use the system were revocable at any time.
To the extent the trustee argues she cannot be held to an agreement made by her predecessor in title, the record reveals that the trustee admitted she was aware of the arrangement before she took title to lot 3. In addition, the Driscoll affidavit asserted that the trustee and John Assad were aware of the diner's use of the pipes and pump station on lot 3. Indeed, the system was created while the Assads were leasing lot 3, shortly before the trustee purchased it. Further, to the extent the trustee argues that recognizing an easement by estoppel would conflict with the Statute of Frauds, the Statute of Frauds is not a defense to an easement by estoppel *885 in these circumstances. See Restatement § 2.9 ("The consequences of a failure to comply with the Statute of Frauds, set out in § 2.8, do not apply if the beneficiary of the servitude, in justifiable reliance on the existence of the servitude, has so changed positon that injustice can be avoided only by giving effect to the parties' intent to create a servitude").
The Restatement provides that a servitude may be created by estoppel only to avoid an injustice. Here, there was evidence that Sea Lavender's costs to create its own system would exceed $75,000 for a property that cost $200,000. Where it is undisputed that Goyette, the prior owner of lot 2, had already contributed to the costs of the system on lot 3, we conclude it would be unjust to force the current owner of lot 2 to create a new system. The illustrations in § 2.10 in the Restatement describe similar scenarios related to significant costs incurred upon permission to construct a large irrigation canal, a well, or a dock in circumstances where the servient estate owner should have known the dominant estate owner would substantially change position in reliance on the belief that permission would not be revoked. See Restatement § 2.10, illustrations 1, 3, and 7.
Section 2.10 of the Restatement, incorporating the comments of § 2.09, suggests we consider the economic burden on the *698 dominant estate. Here, the system was designed to include distribution of the sewage from the diner. Hence, there is no unexpected burden on that system. In addition, Sea Lavender conceded at oral argument that it will contribute its fair share of the costs to operate and maintain the components of the present sewerage system it uses on lot 3. In short, we discern no injustice to the trustee, as owner of lot 3, particularly in comparison to the injustice that would result should Sea Lavender, as the owner of lot 2, be forced to create a new system after the prior owner had contributed already to the system on lot 3.
Conclusion. The portion of the second amended judgment dismissing the trustee's G. L. c. 93A claim is affirmed. In all other respects, the second amended judgment is reversed, and a new judgment shall enter declaring that Sea Lavender, as the owner of lot 2, has a legal right to maintain its connection to and to use the sewer pipes and pump station on lot 3. Sea Lavender has conceded that the trustee is entitled to collect the costs reasonably attributable to Sea Lavender's shared use of the sewerage system on lot 3 since Sea Lavender took title to lot 2, less the amounts it has already paid, and the matter is remanded for further proceedings to determine those amounts.[3]
So ordered.

Although no Massachusetts appellate case has adopted § 2.10 as yet, in Cater v. Bednarek, 462 Mass. 523, 531-532, 969 N.E.2d 705 (2012), the Supreme Judicial Court adopted the rationale in § 7.6 of the Restatement in recognizing extinguishment of an easement by estoppel. The court recognized that the Restatement's policies of preventing the injustice and unjust enrichment that would result if servitude beneficiaries were able to mislead a burdened party into believing that the servitude will be modified or terminated only to then obtain an injunction or judgment for damages when the burdened party violates the servitude "adequately reflect[ ] the equitable concerns that must be considered in determining whether an easement should be modified or extinguished by estoppel." Cater, supra at 532, 969 N.E.2d 705.

The parties' requests for appellate attorney's fees are denied.