NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1396

MATTHEW WALSTON & another[1]

vs.

JAMES BUNN & others.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

These cross appeals from a Land Court judgment concern the ownership and use of various sections of a twenty-five-foot-wide way known as North Street in Edgartown.  We affirm so much of the judgment as determines that the plaintiffs own a section of North Street referred to as Area C by adverse possession, but do not so own the section referred to as Area B.  We vacate the

---

[1] Jean Walston.

[2] Nadia Bunn; North12, LLC; ETown, LLC; Vineyard Oceans, LLC; Mortgage Electronic Registration Systems, Inc., as nominee for Webster Bank, N.A.; Jason Kicza; Desiree Kicza; and Mortgage Electronic Registration Systems, Inc., as nominee for HarborOne Mortgage LLC.  Only the Bunns and North12, LLC, are parties to this appeal.  The remaining defendants need not be discussed further.

remainder of the judgment and remand the case for further
proceedings.

Background.  The parties own properties situated on North
Street, portions of which are located across the street from one
another.  The plaintiffs Matthew and Jean Walston own the house
and lot at 19 North Street (lot 1), on the north[3] side of the
street.  Lot 1, at least on paper, is a corner lot and its
eastern boundary abuts a twenty-five-foot way, referred to in
this case as "MS Way."  The defendant North12, LLC (North12),
owns the house and lot at 12 North Street on the south side of
North Street.  The defendants James and Nadia Bunn own the house
and lot on North Street to the east of lot 1, but separated from
it by MS Way, which runs north to south and intersects North
Street from the north.  The eastern end of North Street
intersects a public way, Peases Point Way, and at least as of
1977, North Street provided access from lot 1 to Peases Point
Way and from there to other public ways.

Lot 1 and two other large parcels abutting North Street
were previously owned by Robert Carroll.  A part of one of those
other parcels later became the North12 property, meaning that
the Walstons' and North12's chains of title have a common

_____

    [3] Although lot 1 actually lies on the northwestern side of
North Street, we adopt the parties' use of simpler directions;
like the Land Court judge, we treat North Street as if it runs
from east to west.

2

grantor, Carroll.  When Carroll sold lot 1 to a predecessor of the Walstons in 1977, the deed included a right of way over North Street, but Carroll retained the fee in the section of North Street that abutted lot 1, and he still owned the North12 property.  When Carroll later transferred the North12 property, he did not expressly retain the fee in that section of North Street, and it passed (we presume by operation of the derelict fee statute, G. L. c. 183, § 58) to others including North12's predecessors.

In count one of their sixth amended complaint (the operative complaint), the Walstons claimed ownership by adverse possession of the fee in North Street along the entire southern boundary of lot 1 (what the judge later labeled Area C, and much of what he labeled Area B).  In count two, the Walstons asserted a quiet title claim.  In count three, the Walstons asserted that North12 was trespassing on lot 1 and on that part of North Street that the Walstons claimed to own by adverse possession (again, Area C and much of Area B).  In count four, the Walstons sought declarations that (a) lot 1 enjoyed a deeded right of way over North Street east to Peases Point Way, by virtue of deeds extending back to Carroll; and (b) North12 was interfering with that right.

The parties' cross motions for partial summary judgment focused on two issues.  The first was whether Carroll, pursuant

to a right of substitution he reserved in his 1977 deed to one of the Walstons' predecessors in title, Thomas Teller, had relocated the right of way over North Street. Carroll assertedly did so by constructing a way known as South Street, which intersected North Street west of lot 1. South Street, once reached by proceeding west on North Street from lot 1, provided access to a public way known as Middle Street. Carroll assertedly allowed Teller and his successor in interest, Stephanie Bell,[4] to use South Street to gain such access.[5] A Land Court judge ruled in favor of the Walstons, concluding that, although Carroll had constructed South Street, and although Teller and Bell had used it to access a public way, Carroll never properly effected the substitution.

The second issue addressed at summary judgment was whether lot 1's deeded right to pass over an eastern part of North Street (east of its intersection with MS Way), which the judge designated the "eastern section," had been extinguished. We

---

[4] The Walstons' chain of title to lot 1 included the 1977 deed from Carroll to Teller, a 1984 deed from Teller to Bell (his daughter), and a 2014 deed from Bell to the Walstons. Teller's and Bell's spouses' names also appeared on the relevant deeds but are omitted here for brevity. Upon Bell's divorce in 2009 or 2010, she resumed using her original surname (Teller), but for clarity we refer to her as Bell in this decision.

[5] South Street became a public way in 2001, as did the portion of North Street at and to the west of its intersection with South Street, and a portion of Middle Street.

4

will use that same nomenclature. This assertedly resulted from Carroll's act of planting shrubs across North Street, east of lot 1, in the late 1970s. The judge ruled in favor of North12's and the Bunns' position that lot 1 had lost that right to pass over the eastern section.

After a trial of the remaining claims, the judge issued detailed findings and rulings, along with a plan of the North Street area to which he added markings to illustrate those rulings.[6] The judge focused on three principal issues. First, he ruled that the Walstons owned a small area of North Street he labeled Area A, by virtue of their 2020 purchase from Carroll's heirs of the fee in MS Way, combined with the effect of the derelict fee statute, G. L. c. 183, § 58. Second, the judge ruled that the Walstons and their predecessor Bell had acquired, by adverse possession, the fee in a western part of North Street that the judge labeled Area C, but not in an adjacent part of North Street that he labeled Area B. Third, the judge ruled that lot 1 had lost, through abandonment by Teller and Bell, the right of way over Area B.

Judgment then entered declaring the rights of the parties and ordering North12 to cease trespassing on Areas A and C and

_____

[6] We take judicial notice that the plan may be viewed on MassCourts as part of the judgment in Walston vs. North12, LLC, Land Court Department Dock. No. 20 MISC 000207 (Oct. 15, 2024).

5

to restore them to their previous condition.  Both the Walstons and North12 appealed.

Discussion.  The cross appeals raise five main issues.  The Walstons challenge (1) the ruling at summary judgment that lot 1's right of way over the eastern section was extinguished by prescription and (2) the ruling after trial that lot 1's right of way over Area B was extinguished by abandonment.[7]

North12, for its part, challenges (3) the ruling at summary judgment that Carroll had failed to effect a substitution for lot 1's right of way over North Street, (4) the ruling after trial that the Walstons and their predecessor Bell acquired all of Area C by adverse possession, and (5) the ruling after trial that the Walstons own the fee in Area A.  We address the issues in that order.

1.  Eastern section; prescription.  The Walstons challenge the judge's summary judgment ruling that Carroll planted shrubs across North Street in the late 1970s (when he still held the fee in North Street as it abutted and ran east from lot 1).  The judge ruled that these shrubs blocked lot 1's access to the eastern section and thus extinguished by prescription lot 1's

_____

[7] The Walstons also challenge the judge's ruling that they have not acquired Area B by adverse possession.  We defer discussion of that issue until that part of our decision addressing the judge's adverse possession ruling on Area C.

6

easement over that section.[8]  See Cater v. Bednarek, 462 Mass.
523, 528 n.16 (2012) (acts of servient estate holder
inconsistent with easement may extinguish it by prescription).

The grant of summary judgment on this issue was error,
because the Walstons' summary judgment opposition materials
showed that there was a genuine dispute of material fact over
whether Carroll had planted any shrubs or taken any other action
to block lot 1's access to the eastern section.  In particular,
the Walstons argued that although Teller (the key witness on the
point) testified at his deposition that "I think [Carroll] just
put shrubs up there and stuff" to block North Street, Teller
immediately thereafter testified, "I really don't know because I
never went out there."  North12, in response, argued that
Teller's testimony established a blockage, although not
necessarily by Carroll.  "In reviewing an order granting summary
judgment . . . we . . . consider the facts in their light most
favorable to the nonmoving party, drawing all reasonable
inferences in [that party's] favor."  Sullivan v. Liberty Mut.
Ins. Co., 444 Mass. 34, 38 (2005).  On the issue of

---

[8] North12's and the Bunns' summary judgment motions argued
that lot 1's right of way had been extinguished primarily by
abandonment, rather than prescription, but their arguments
referred to, among other assertedly undisputed facts, Carroll's
claimed blockage of the right of way.  As to the eastern
section, at summary judgment, the judge rejected the abandonment
theory but accepted the prescription theory.

extinguishment by prescription, the Walstons were the nonmoving parties. Viewing the summary judgment record in the light most favorable to them -- in particular, Teller's admission that he lacked personal knowledge -- Teller's testimony was without foundation and could not establish an intentional blockage by anyone, let alone Carroll. The mere presence of shrubs, unless planted by a servient tenant, does not show extinguishment by prescription. See Desotell v. Szczygiel, 338 Mass. 153, 159 (1958).[9] Accordingly, it was error to award summary judgment to North12 on the eastern section.

This and other factual disputes relating to prescription could have been resolved at trial, where Teller essentially repeated his equivocal deposition testimony, and where other evidence bearing on the issue of blockage by Carroll was offered. But the judge made quite clear to the parties that he would not allow them to use trial evidence to challenge his summary judgment ruling on this or other issues, and we cannot make credibility determinations on appeal. The factual disputes regarding prescription of lot 1's easement over the eastern

---

[9] Elsewhere in his summary judgment decision the judge stated that Carroll "installed (or allowed the growth of) the [s]hrubs." Allowing shrubs to grow would not be an act of the servient tenant, as is required for extinguishment by prescription. See Cater, 462 Mass. at 528 n.16.

section were thus never appropriately resolved and must now be resolved on remand.

We are unpersuaded by the Bunns' argument that we should affirm the judgment as to the eastern section on the alternative ground of abandonment. The Bunns rely on the judge's finding after trial that, once Carroll built South Street, Teller and Bell "intended . . . to abandon [North Street] as a means of reaching anything east of Area C," which would include the eastern section (as well as Area B). The problem with the Bunns' argument is that, as we explain next, the abandonment ruling itself was based on an erroneous legal standard. We are therefore constrained to vacate so much of the judgment as addresses lot 1's right of way over the eastern section and remand the claim for further proceedings.[10]

2. Area B; abandonment. The Walstons challenge the judge's ruling after trial that lot 1's right of way over Area B was extinguished by abandonment. The judge so ruled based on his finding that, once Carroll built South Street and Teller and Bell were able to use it for access to a public way, Teller and Bell had ceased using North Street except as a means of access west to South Street, which did not require travel over Area B.

_____

[10] We express no view on whether the judge could make the necessary findings on the existing record, without further evidentiary proceedings.

9

Although the judge had ruled at summary judgment that Carroll never properly exercised his right to substitute another right of way for the one leading east over North Street, the judge found at trial that Teller nevertheless believed Carroll had done so. Teller considered Carroll's right of substitution to be an agreement, which Carroll had performed and which Teller in turn felt bound to perform. The judge ruled that Teller's and Bell's intent to carry out Teller's promise not to use North Street once Carroll made alternative access available, coupled with their nonuse of Area B once Carroll did so, sufficed to show that they had abandoned their right to use Area B.

This was error, because abandonment "requires a showing of intent to abandon the easement by acts inconsistent with the continued existence of the easement" (emphasis added). Cater, 462 Mass. at 528 n.15. "[N]onuse of itself, no matter how long continued, will not work an abandonment" (citation omitted). Id. To show abandonment, a party is "required to prove not mere lack of use, but acts by the owner of the dominant estate conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its further existence" (emphasis added; quotation and citation omitted). Benvenuto v. 204 Hanover, LLC, 97 Mass. App. Ct. 140, 149 (2020). "[S]ome affirmative conduct by [the easement holder] inconsistent with the exercise of the easement" must be

shown.  Id. at 149-150.  This is a "rigorous standard" and the party claiming abandonment has a "heavy" burden.  Proulx v. D'Urso, 60 Mass. App. Ct. 701, 704 n.2 (2004).  Although "abandonment is usually a question of fact," Willets v. Langhaar, 212 Mass. 573, 575 (1912), that fact must be determined using correct legal standards.

Here, although the judge acknowledged the rule that abandonment required conclusive and unequivocal acts by Teller or Bell (not merely nonuse), he did not identify any such acts. Nor can we agree that abandonment may be shown by nonuse coupled only with an intent to abandon, without that intent being "conclusively and unequivocally manifest[ed]" by any act of the easement holder.  Benvenuto, 97 Mass. App. Ct. at 149.  The parties have not cited, nor have we found, any authority in Massachusetts or elsewhere establishing that nonuse together with an unmanifested intent is enough.[11]

---

[11] The judge made no finding that, once Carroll built South Street, Teller or Bell made any statements to Carroll or anyone else of their intent or agreement to abandon the easement east over North Street.  Even if they had done so, it does not appear that such a statement would be a sufficient "act" to work an abandonment.  "An oral or written statement by an easement holder that the holder intends to give up the servitude generally does not satisfy the affirmative conduct standard" (footnote omitted).  J.W. Bruce, J.W. Ely, Jr., & E.T. Brading, The Law of Easements & Licenses in Land § 10:20 (2025-2 ed.) (Law of Easements & Licenses in Land).

11

North12 nevertheless maintains that an easement holder may be held to have engaged in affirmative conduct merely by acquiescing in conduct by the servient estate holder that is inconsistent with the easement. For that proposition, North12 relies on this court's statement in The 107 Manor Ave. LLC v. Fontanella, 74 Mass. App. Ct. 155, 158 (2009) (107 Manor Ave.). There we said, "Our cases indicate that failure to protest acts which are inconsistent with the existence of an easement, particularly where one has knowledge of the right to use the easement, permits an inference of abandonment." 107 Manor Ave., supra, citing Sindler v. William M. Bailey Co., 348 Mass. 589, 593 (1965), and Lund v. Cox, 281 Mass. 484, 492-493 (1933). But 107 Manor Ave. did not characterize acquiescence either as conduct or as otherwise sufficient to establish abandonment. See 107 Manor Ave., supra at 158-159. Moreover, in 107 Manor Ave., the easement holders had indeed engaged in affirmative conduct: they had extended their lawn into a portion of the right of way at issue, showing their intention not to use it as a way. Id. at 159. See Benvenuto, 97 Mass. App. Ct. at 149-150 (relying on this feature of 107 Manor Ave.). The Walstons' predecessors did nothing similar here -- and when North12's predecessors took action to block the way with fencing, the Walstons filed suit.

12

It is true that the 1965 Sindler decision and the 1933 Lund decision relied on in 107 Manor Ave. did not state or apply the requirement of affirmative conduct by the easement holder before abandonment may be found. See Sindler, 348 Mass. at 592-593; Lund, 281 Mass. at 492-493. But the Supreme Judicial Court stated and applied that requirement both (1) before Sindler and Lund, see Dubinsky v. Cama, 261 Mass. 47, 57 (1927), and cases cited; and (2) after Sindler and Lund, see Cater, 462 Mass. at 528 n.15. This court, too, has stated and applied the affirmative conduct requirement in two recent cases. See Trustees of the Beechwood Village Condominium Trust v. USAlliance Fed. Credit Union, 100 Mass. App. Ct. 192, 197 (2021); Benvenuto, 97 Mass. App. Ct. at 149. We are not free to depart from that requirement.

Moreover, in both Sindler and Lund, the court relied on the easement holder's acquiescence in conduct by or for the benefit of the servient estate holder that was inconsistent with the existence of the easement. See Sindler, 348 Mass. at 593 (placement of chain); Lund, 281 Mass. at 489-490, 492-493 (construction of walls and buildings). See also First Nat'l Bank of Boston v. Konner, 373 Mass. 463, 467 (1977) (noting this aspect of Sindler). That element is missing here, where it is not apparent that Carroll, as the servient estate holder, took any such action inconsistent with the easement in Area B. Even

13

if Carroll planted the shrubs, they would not have blocked Teller's and Bell's access to Area B.  And although Carroll's construction of South Street allowed additional access from lot 1 to a public way, such access was not inconsistent with lot 1's then-existing access over Area B and the eastern section of North Street out to a different public way.  Even if that then-existing access was no longer necessary, "lack of necessity or obsolescence will not, alone, suffice to extinguish an express easement."[12]  107 Manor Ave., 74 Mass. App. Ct. at 160, citing Emery v. Crowley, 371 Mass. 489, 495 (1976).

Although we see no sufficient affirmative conduct by Teller and Bell, we acknowledge another potential basis for abandonment:  the judge's findings that, in 2015-2016, the Walstons extended their lawn and an underground sprinkler system

---

[12] The mere use of alternative access, such as over South Street, is ordinarily insufficient to prove abandonment.  See Law of Easements & Licenses in Land § 10:20 & n.8.  Such use is not necessarily "inconsistent with the continued existence of the easement" (emphasis added).  Cater, 462 Mass. at 528 n.15.  That is particularly so where the alternative access exists not as of right but only because it is tolerated by other landowners.  See Law of Easements & Licenses in Land, supra at n.12, citing Consolidated Rail Corp. v. MASP Equipment Corp., 67 N.Y.2d 35, 40 (1986).  As we shall discuss, because Carroll failed to properly effect substitution, Teller and Bell had no legal right to use South Street, at least for the first twenty years that they used it.

into Area B.[13]  Cf. 107 Manor Ave., 74 Mass. App. Ct. at 159

(extending lawn into right of way showed intention not to use it

as way).  But the judge also found that the Walstons

occasionally parked cars there.  In addition, Matthew Walston

testified that he had left gravel underneath the lawn in this

area "because we knew we were going to drive on it," and he was

"able to still drive and park [his] cars" there even after

sprinklers were installed.  Although North12 asserted in its

closing argument at trial that extension of the lawn and

sprinkler system constituted evidence of intent to abandon, the

judge made no finding on that issue.  Therefore, North12's claim

that the Walstons' conduct conclusively and unequivocally showed

their intent to abandon cannot be resolved without additional

findings by the judge.[14]  We remand for that purpose.

3.  Substitution.  North12 challenges the judge's ruling at

summary judgment that Carroll, despite reserving in his deed of

lot 1 to Teller the right to substitute another right of way for

lot 1's right of way over North Street to Peases Point Way, had

---

[13] The judge's findings on this issue applied to Area C as well, but whether the easement over Area C was abandoned is moot in light of the judge's ruling that the Walstons acquired the fee in Area C by adverse possession -- a ruling we affirm infra.

[14] We again express no view on whether the judge could do so on the existing record, without further evidentiary proceedings.

15

failed to accomplish such a substitution. Carroll's deed of lot 1 to Teller stated in pertinent part:

> "The premises are conveyed subject to and with the benefit of the right to use [North Street] for all purposes including utilities which public streets and ways are used in the Town of Edgartown in common with those lawfully entitled thereto <u>on the condition that at any time Grantor herein [Carroll] may substitute another right of way</u> at which time the Grantee herein [Teller] by acceptance of this deed hereby agrees to relinquish all rights in and to [North Street], <u>provided, however, that said substituted right of way leads to a public way</u>" (emphasis added).

The judge ruled that although Carroll built South Street, and although lot 1's owners Teller and Bell were able to use South Street in the course of gaining access between lot 1 and a public way, Carroll never effected the substitution, for two reasons.

First, the judge reasoned that lot 1 still had to use a western portion of North Street to obtain access to South Street Therefore, the attempted substitution could not have extinguished the entirety of lot 1's right to use North Street.

Second, less than a year after Carroll built South Street (sometime in or after December 1977), he transferred the fee in South Street, along with the fee in the four lots abutting it, to four other owners. Carroll did so without reserving for the benefit of lot 1 any right to use South Street to access a public way, and South Street itself did not become a public way until 2001. Thus, the judge found that lot 1 had no

16

"immediately enforceable rights" to use South Street. Put differently, Carroll did not "substitute another <u>right</u> of way" as the deed authorized him to do (emphasis added). Carroll merely created a new road and, apparently, acquiesced in the Walstons' predecessors' use of it during the brief period that Carroll continued to own it (until October 1978). He did nothing more. For the Walstons' predecessors to acquire a right to use South Street (before South Street itself became a public way in 2001), they would have had to use it for the twenty-year prescriptive period without permission from the four abutting owners (who from October 1978 onward did not include Carroll).

On appeal, North12 does not seriously challenge, and we see no error in, the judge's conclusion that Carroll's attempted substitution did not comply with the terms of his deed to Teller.[15] Instead, North12 argues that, because Teller believed that substitution had occurred and acquiesced in it, the Walstons are now estopped from arguing that it did not occur. We are not persuaded.

North12 relies on the following proposition:

---

[15] North12's brief (with emphasis added) states in an argument heading that Carroll "did substitute an alternative <u>right</u> of way," but the argument following the heading refers only to "an alternative <u>means</u> of access," and recognizes that Carroll did not confer on Teller and successor owners of lot 1 any "right" to use South Street.

17

> "[T]he original easement may be deemed relocated when the conduct of the parties is such as to permit a conclusion that a different easement had been substituted for the way mentioned in the deeds because the evidence reflects a tacit understanding or an implied agreement, manifested by the dominant owner's acquiescence in the use of the different easement in lieu of the original for a number of years" (quotations and citation omitted).

Proulx, 60 Mass. App. Ct. at 705.  But North12 fails to address the judge's correct ruling that Carroll, despite building South Street, never provided an "easement" over it to lot 1.  Carroll apparently did not object to whatever use lot 1 made of South Street, but he gave lot 1 no "immediately enforceable rights" to use it.[16]

That lot 1 might have acquired such rights from other owners by prescription after twenty years of use, and that in any event lot 1 acquired a right to use South Street once it

---

[16] Relatedly, even if Carroll had given lot 1 a right to use South Street to access a public way, Carroll did not give lot 1 any right to reach South Street.  As the judge recognized, this could be accomplished from lot 1 only by "heading westbound" over North Street.  That portion of North Street included a segment abutting what the judge referred to as "Ms. Teller's lot."  As the judge also recognized, it was undisputed that Carroll's 1977 acquisition of the fee in North Street did not include the segment abutting "Ms. Teller's lot."  North12 has cited nothing in the record showing that Carroll ever owned the fee in or a right of way over that segment.  If he did not, he could not have included such a right of way in his deed of lot 1 to Teller or as part of his attempted substitution for the right of way specified in that deed.  Nor was that segment included in what the town made a public way in 2001.  If lot 1 had no right to pass over that segment, then Carroll's attempted substitution failed.  Lot 1 may have acquired such a right by prescription or otherwise, but North12 made no such showing.

became a public way in 2001, is fortunate for lot 1.  But those happenstances do not retroactively remedy Carroll's 1978 failure to substitute a different easement -- a "right" of way -- for the easement specified in the deed.  North12 cites no case suggesting that a valid substitution or relocation may be accomplished in this fashion.

Similarly unavailing is North12's reliance on the following principle:

> "It is well settled that the owner of land subject to a right of way may, with the assent of the owner of the dominant estate, substitute on his own land a new way for the old way, and that when the change is actually made and a new way is thus adopted by them, it fixes and determines their respective rights by dedication or by estoppel" (emphases added).

Byrne v. Savoie, 225 Mass. 338, 340 (1916).  See Assad v. Sea Lavender, LLC, 95 Mass. App. Ct. 689, 694 (2019) (same).  But here, although South Street was initially on Carroll's "own land," he sold that land less than a year later, without reserving any right for lot 1 to use it.  If Carroll "adopted" South Street as the new right of way at all, it was for a period too brief to have "fixe[d] and determine[d]" any right of lot 1 to use South Street.  Byrne, supra.  Again, North12 cites no case applying the principle stated in Byrne to rule that an easement has been substituted or relocated in circumstances like those present here.  Therefore, and because lot 1 still had to use a western portion of North Street to obtain access to South

19

Street, North12 has shown no error in the judge's ruling that substitution did not occur.

4. Areas C and B; adverse possession. North12, as the record owner of Area C and Area B, challenges the judge's ruling after trial that lot 1, through the actions of Teller, Bell, and the Walstons, acquired all of Area C by adverse possession. North12 argues that the judge should have drawn the line between Area C and Area B (i.e., between what lot 1 did and did not acquire by adverse possession) no further east than the eastern edge of a former driveway used by Bell.[17] The Walstons, for their part, contend that lot 1 not only acquired all of Area C by adverse possession (as the judge ruled) but also acquired Area B by adverse possession (a claim the judge rejected). In short, both North12 and the Walstons argue that the judge erred in determining the extent of lot 1's adverse possession.

"A party claiming title to land through adverse possession must establish actual, open, exclusive, and nonpermissive use for a continuous period of twenty years." Totman v. Malloy, 431 Mass. 143, 145 (2000). "The nature and the extent of occupancy

---

[17] The judge's finding of fact number 13 places the line "approximately [fifty-five] feet west of the eastern edge of the MS Way (if it had continued into [North Street])." The record does not show how much farther west of that line the former driveway began. At oral argument, North12 stated that it did not challenge the judge's adverse possession ruling as to the portion of Area C west of a fence across North Street erected by North12's predecessor in interest.

required to establish a right by adverse possession vary with the character of the land, the purposes for which it is adapted, and the uses to which it has been put" (citation omitted). Aspell v. Raad, 106 Mass. App. Ct. 291, 293 (2025).

a. Area C. Conceding that the Walstons have acquired the western portion of Area C by adverse possession, North12 focuses instead on the part of Area C east of the former driveway, arguing that Bell's use of that area was not "continuous" but "at most[] intermittent." "'[C]ontinuous use' does not necessarily mean 'constant use.'" Bodfish v. Bodfish, 105 Mass. 317, 319 (1870). A finding of "use[] in each of the twenty consecutive years" justifies a finding of "continuous enjoyment," even without "evidence of actual use in each year of the twenty." Id. at 320. Where an adverse use has been regular, that it was periodic rather than constant does not "require a finding that the adverse use of the [area] was not continuous." Stagman v. Kyhos, 19 Mass. App. Ct. 590, 593 (1985), quoting Mahoney v. Heebner, 343 Mass. 770, 770 (1961).

The judge found as fact that Teller and then Bell (along with her husband) used the part of Area C east of the driveway from 1988 through 2014, primarily for parking vehicles. He further found that the vehicles "blocked all use of" Area C "except when Teller or Bell chose." In the period from 1988 (if not earlier) through 2014, other than crews occasionally

21

maintaining overhead wires, "no one used [Area C] except for Teller, Bell, and their guests and invitees." Although the judge acknowledged that these uses "were varied in their nature and extent," he also recognized that "continuous" use does not require "constant" use. See Bodfish, 105 Mass. at 319. The judge further found that from 2015 through 2019, the Walstons cleared, regraded, and planted a lawn in Area C (including its eastern portion, as shown by photographs admitted in evidence). They used the lawn primarily for recreation.

We have carefully reviewed the evidence and North12's challenges to the judge's findings on this issue and conclude that, with one minor exception, those findings are not clearly erroneous.[18] We also conclude that the findings warranted the judge's determination that the Walstons, by their actions tacked together with those of Teller and Bell, own the entirety of Area C by adverse possession, including its eastern portion.

b. Area B. The Walstons claim that they also acquired Area B by adverse possession and that the judge erred in ruling

_____

[18] North12 challenges the judge's finding that, during a period when Bell operated a taxi service from lot 1, "[t]he taxis would often park in Area C, including portions of Area C east of the [d]riveway." Although the judge could reasonably infer that the taxis were parked somewhere in Area C, we agree with North12 that there was no evidence specifically supporting the finding of parking in Area C's eastern portion. That finding was not, however, essential to the judge's ruling regarding adverse possession of that eastern portion.

22

otherwise.  The judge ruled that "[w]hat distinguishes their claims to the two Areas is the extent of the proof of adverse use."  He found that "Teller and Bell didn't park vehicles in Area B."  Indeed, "[t]he Walstons failed to prove that Teller and Bell made any continuous use of Area B."  After a careful review of the evidence, including in particular the many aerial photographs showing the presence or absence of parked vehicles, we conclude that the judge's findings were not clearly erroneous.[19]  We therefore do not disturb his ruling that the Walstons did not acquire title to Area B by adverse possession.[20]

5.  Area A; derelict fee statute.  North12 challenges the judge's ruling that the Walstons, when they purchased MS Way in 2020 from Carroll's heirs, thereby also acquired the fee in the abutting Area A,[21] by operation of the derelict fee statute, G. L. c. 183, § 58.  North12 argues that the ruling was

---

[19] The judge's placement of the line between Areas C and B, see supra note 17, appears to correspond to the easternmost extent of Bell's regular parking of vehicles -- specifically, the eastern end of a large recreational vehicle, owned by Bell's then-husband, that is visible in numerous aerial photographs.

[20] We thus pass over the point that, as with Area A as discussed infra, the Walstons' complaint appears not to have asserted any adverse possession claim to that portion of Area B lying to the east of the part of North Street that abutted lot 1, i.e., that portion of Area B lying immediately south of Area A.

[21] The judge defined Area A as "that part of [North Street] that abuts the MS Way to the south, to the midpoint of [North Street]."

23

procedurally improper, because the Walstons never asserted any claim to own Area A under that statute; instead, North12 asserts the issue was first identified and decided by the judge after trial, without affording the parties a chance to be heard. We agree with North12 on this point and thus need not reach North12's additional argument that the judge misapplied the derelict fee statute.

As North12 argues, the operative version of the Walstons' four-count complaint did not assert any claim of ownership of Area A. That complaint asserted an adverse possession claim only as to North Street "along the southerly boundary of the Walston Property," which the complaint variously defined as 19 North Street or as lot 1. Area A does not lie in that part of North Street along the southerly boundary of the "Walston Property" as so defined; rather, area A lies farther east, along the southerly boundary of MS Way.[22] The quiet title claim, insofar as it concerned North Street, was similarly limited. And the trespass and declaratory judgment claims asserted the Walstons' right to use the right of way over North Street, which

---

[22] The Walstons filed their initial complaint and first and second amended complaints before, and without alleging that, they owned the MS Way. Their third through sixth amended complaints alleged ownership of the MS Way but did not change their definition of the "Walston Property" or otherwise assert ownership of Area A as it abutted the MS Way.

24

included what the judge later labeled Area A, but did not assert ownership of the fee in Area A itself.

The Walstons nevertheless argue that ownership of Area A was encompassed in one of the issues that North12 itself identified for trial in the parties' joint pretrial memorandum.[23] We are not persuaded. The issue North12 identified was whether the Walstons or their predecessors in interest had "<u>abandoned and/or relinquished any interest in</u>, or right to pass and repass over, <u>portions of North Street</u>" (emphases added). Although ownership of Area A would constitute an interest in a portion of North Street -- and although one cannot abandon or relinquish what one does not own -- the Walstons could not have acquired ownership of Area A (if at all) by operation of the derelict fee statute until they acquired ownership of MS Way from Carroll's heirs, which was in 2020. By that point, North12's predecessors in interest had already blocked the Walstons' access to Area A (among other areas) by erecting a fence along its northern edge and across North Street.

At no point in this case was there any claim that the Walstons, by the time of trial in 2024, had abandoned or relinquished a fee interest that they did not even arguably

---

[23] The Walstons themselves, in their section of the joint pretrial memorandum, did not identify ownership of Area A as an issue for trial. Nor did their pretrial brief.

acquire until 2020, after access to the area was blocked and after this litigation was commenced.  The statement in the pretrial memorandum thus cannot have been intended to and would not have been understood as putting in issue the ownership of Area A by virtue of the derelict fee statute.  And we see nothing in the trial transcript, including the parties' closing arguments, that mentions the issue or the derelict fee statute.

As this court stated in Messina v. Scheft, 20 Mass. App. Ct. 945, 945 (1985):

> "Serious problems may be created whenever a judge bases a decision on an issue that is not before the court. . . . We are not stating that a judge at a bench trial is held to deciding only those issues raised by the parties.  We recognize that there will be instances where a judge may glimpse an issue not perceived by the parties.  On those occasions, the course that the judge should follow is to notify counsel of his concerns and permit counsel to present evidence on the question which the judge perceives to be dispositive."

The same principle applies even if an issue first identified by a judge is one of law that requires no additional evidence to resolve.  The parties are entitled to an opportunity to be heard, commensurate with the significance of the issue raised. Nothing in this decision prevents the Walstons from now asserting this claim to Area A.

Conclusion.  We agree with the judge's rulings that the right of substitution reserved in the 1977 deed of lot 1 was never properly exercised, and that the Walstons own Area C, but

26

not Area B, by adverse possession.  We are unable to agree on this record with the judge's rulings that the Walstons and their predecessors' right to pass over the eastern section was extinguished by prescription or that they lost by abandonment the right to pass over Area B.  Those rulings require further consideration on remand.  Finally, the ruling that the Walstons acquired the fee in Area A by operation of the derelict fee statute was made without notice to North12 and the Bunns of such a claim and therefore cannot stand.

Accordingly, so much of the judgment as implements the rulings that the reserved right of substitution was never properly exercised, and that the Walstons own Area C, but not Area B, by adverse possession is affirmed.  The judgment is otherwise vacated and the matter is remanded for further proceedings consistent with this memorandum and order.

So ordered.

By the Court (Henry, Sacks &
  Tan, JJ.[24]),

Clerk

Entered:  January 20, 2026.

---

[24] The panelists are listed in order of seniority.